REQUESTED BY: Senator Jerome Warner Nebraska State Legislature State Capitol Lincoln, Nebraska 68509
Dear Senator Warner:
You have asked the following question:
 My question is whether or not the state board when setting the income tax rate must take into consideration a prospective change in the federal income tax law that is scheduled to occur within the calendar year for which the rates are being set.
You ask your question in light of the special legislative session currently proceeding. This legislative session occurred as a result of a determination made by the Governor that the fiscal condition of the state was such that the budget adopted by the Eighty-seventh Legislature, Second Session, 1982, had to be reduced.
Two other factors enter into this consideration. The first is the requirement of Neb.Rev.Stat. § 77-2715.01
(Supp. 1982) that the State Board of Equalization and Assessment meet on or before November 15 of each year to set the rate of taxation for the subsequent calendar year. In addition, under Neb.Rev.Stat. § 77-2715.02(4) the State Board of Equalization is required to meet whenever the accumulated total receipts of the General Fund at the end of any quarter or fiscal year are less than 95 percent of the projected receipts for such period as determined by the State Tax Commissioner.
You point out in your letter that pursuant to federal legislation it is anticipated that a 10 percent reduction in federal taxation for individual income tax rates will take effect on July 1, 1983. You also point out that certain other federal tax changes will occur, including deductions for contributions to individual retirement accounts, net operating loss carry forward periods, and an offset of the `marriage penalty' and will have a significant impact on individual income tax rates under the federal system.
The Legislature in the last regular session adopted LB 693 which amended § 77-2715.01(2). That section had previously required a meeting within 30 days after receiving a report of the Tax Commissioner that there had been significant changes in the provisions of the Internal Revenue Code. LB 693 provides that such a meeting must be held not later than 60 days after passage or approval of such changes or within 15 days prior to the effective date of any changes if the federal changes would increase or decrease projected income in any 12 month period by an amount equal to or greater than the revenue raised from such sources by one-half percent tax rate increment. The amendment also required the board to adjust the rate of income tax so that the taxes levied, as nearly as possible, would equal income which would have occurred and there been no change.
Your question then goes to the exact requirements facing the Board of Equalization at their meeting scheduled for November 15. In making this determination we must examine the provisions of Neb.Rev.Stat. § 77-2715.01 and 77-2715.02
(Supp. 1982). Section 77-2715.01 is divided into three subparts. The first part deals with the regular annual meeting of the state board for purposes of prospectively establishing sales and income tax rates for the following calendar year. Subsection (2) deals with meetings of the board within 15 days after adjournment of a regular session of the Legislature, within 30 days after a meeting of a special session of the Legislature, and the above referred amendment of the last session where a change has occurred in federal tax laws. The third paragraph deals with the public notice required of the Tax Commissioner that is to be published regarding such meetings.
Section 77-2715.02 provides a third method of calling a meeting and that is when receipts are less than 95 percent or more than 100 percent of projected receipts for the fiscal year. It also authorizes the Governor to call a meeting at any time there is a need to review General Fund cash flow or in response to revisions in revenue projections as set forth therein.
It can thus be seen that there are a variety of triggering mechanisms which may result in a meeting of the State Board of Equalization and Assessment. The particular meeting to which you refer falls within two of the categories described above, that is, the regular annual meeting and the meeting as a result of shortfalls in receipts as compared with previous projections. The November 15 meeting is not occurring under subsection (2) of § 77-2715.01. We therefore believe that the provisions of subsection (2) need not concern the State Board of Equalization at their November 15 meeting. That being the case, we must analyze the provisions of subsection (1) to determine what requirements face the state board at the November 15 meeting.
In this regard, the first two paragraphs of the subsection provide that the meeting is for the purpose of setting the income and sales tax rates for the succeeding calendar year. The sections require that acts having fiscal impact be considered. It requires the rates be set based on appropriations and express obligations for the two succeeding calendar years following the date of the meeting. The section also provides, `Such action will provide an adequate cash flow, the orderly implementation of funding of acts as intended by the Legislature, and eliminate drastic fluctuations in the state sales and income tax rates.' Subsections (a) through (h) then set out steps to be followed by the board in making their determination as to the appropriate rates to be set. The board is first required to determine the status of appropriations and express obligations from a certified statement prepared by the Director of Administrative Services. They are to add, then, the appropriations and express obligations resulting from a special session of the Legislature. They then determine the balance of the General Fund at the beginning of the period under consideration and the estimated receipts to the General Fund from all sources for that same period.
Next, the board is required to set the rates so that the funds available will be not less than 2 nor more than 7 percent in excess of appropriations and express obligations for the two succeeding calendar years. The section defines express obligations as follows: `For purposes of this section, express obligation shall mean an obligation which has a fiscal impact identifiable by a sum certain or by an established percentage or other determinative factor or factors.'
It is clear that the board is required to set rates which will provide an adequate cash flow and to eliminate drastic fluctuations in sales and income tax rates. It is obvious that they are required to consider legislative acts to be funded in the subsequent fiscal year and other items which may be considered express obligations about which more will be said later. They are required to determine the balance in the General Fund at the beginning of the period under consideration and the estimated receipts to the General Fund from all sources for that same period. The board is required to then establish the rates at a level which will provide a cushion of not less than 2 percent or more than 7 percent in excess of the appropriations and express obligations.
It is relatively obvious that `appropriations' is not a difficult concept. It is also relatively obvious that express obligations, notwithstanding the definitions provided, is less clear. This office in Report of the Attorney General, 1975-1976, Opinion No. 141, page 201, expressed some reservation with regard to the language `express obligation' as contained within this statute and as defined within the Nebraska Sales and Income Tax provisions. We there said:
 We do not believe that the definition found in Section 77-2715.01 is helpful. It attempts to define `express obligations' by the use of the word `obligation' and does not define what an obligation is. To what extent is the Legislature `obligated' to finance programs for which it has not yet appropriated money?. . . There are many programs which, as a political matter, the Legislature is certain to continue, but can we say they are `obligations?' We think not.
 To the extent that `express obligations' have been identified, they can, and should be taken into account. Some are identified in Section 77-2715.03(1). We believe that in some cases the Legislature, in enacting statutes dealing with certain programs, have said that those programs should be considered express obligations by the state board. Where that has happened, the board should obey the legislative mandate.
The definitions contained in Neb.Rev.Stat. § 77-2715.03
and § 77-2715.01 referred to in Opinion No. 141, have not been changed. We adhere to the views expressed in that opinion. It is therefore our belief that the term `express obligation' is such that it is not useful in determining whether or not changes in the tax laws are of necessity to be considered by the state board setting tax rates at the November 15 meeting.
We nonetheless believe that the board is required to determine what the estimated receipts from sales, use, income and franchise taxes will be for the upcoming fiscal year. In making that determination, we believe the board must deal with both the currently existing federal tax provisions and those provisions which are to become effective during the calendar year. Since our state tax system is piggybacked on to the federal system, anything which will affect the amount of federal income tax paid will obviously affect the amount of state income tax paid and thus have an effect on anticipated receipts in the coming calendar year. This may require some speculation but that is inherent in the system we follow. While it is possible that the prospective tax decrease may not in fact occur, it is equally, if not more possible, that the decrease will occur. Under these conditions we believe the board must consider the effect the decrease may have on receipts under (1)(a) and (1)(c) and must set the rates of sales and income tax so that receipts will be sufficient to meet the requirement of (1)(d) that there be an adequate General Fund balance. These requirements all arise under the first subsection of77-2715.01.
Sincerely, PAUL L. DOUGLAS Attorney General Patrick T. O'Brien Assistant Attorney General